On call last, State of Illinois, California. Third division is now in session. The Honorable Justice James Fitzgerald Smith is acting. Have a seat. Call the case. 15-11-66 Memphis Casino Joliet Corp. v. W. E. O'Neil Construction Co. So please step up and identify yourselves. And who's going to do what to whom? Good morning, Your Honor. Your Honors. Mark Rabinowitz from Cozen O'Connor on behalf of the plaintiff's appellants, Empress Casino Joliet Corporation, National Fire and Marine Insurance Company, and Lloyds Syndicate, 1414 Ascot. Mr. Green will be delivering a portion of the argument on behalf of Access Insurance Company. Kevin Killeher, also of Cozen O'Connor. All right. And Your Honor, Brady Green of Duke and Franklin against the case on behalf of Access Insurance. Good morning. Bob Franklin on behalf of W. E. O'Neil Construction Company. On behalf of the joint defendants with the exception of Atlas, which are going to be presented by my friend and colleague Dan Boho. What's your name again? Dan Boho. Dan, okay. I should know that. We would like to divide our time up. I'll take 13 minutes. My colleague will take some more. Mr. Boho, is that accepted? It is. Further, we have a series of boards, actually it's two as part of the record. It was used in the argument at the trial level. I don't know that we use them today, but we would ask the court for the ability to use them if we think it's necessary given the arguments. Fine. We'd like to accept this. So you understand we're pretty liberal, but that doesn't mean you want to be here at noon because he has to go somewhere at some point. So please move along. Indeed. Would you like us to proceed? You are aware that this is the panel of which Joe Gordon originated from, so you're aware of what that means. Regarding the fireboard case. Okay. Thank you. May I proceed, Your Honor? Except you don't need to go into any details of what occurred, just the law. I understand. I intend it's going to be 20 minutes as rule 352. No, we're giving you freedom. Ah, thank you. But as I said, not until tomorrow. I understand. I understand. And Mr. Green would like to contribute to the extent that's necessary as to the issues that affect Access Insurance Company because they are uniquely situated in this case. Okay. May it please the Court. The plaintiffs submit that the trial court erred by entering summary judgment in defendant's favor because the waiver of separation clause applies, does not apply beyond the builder's risk policy and clearly did not apply to the uninsured claims of Empress, the casino, or the property insurer's subrogation claims, the non-builder's property insurer's subrogation claims. The defendants urged the trial court to adopt a philosophy of complete risk transfer and to ignore the operative, and we contend, governing and dispositive terms of the construction contract. How do you deal with intergovernmental risk in 11.47 as Joe Gordon expressed it? So intergovernmental risk dealt with a property policy, as the Court knows, that had coverage, expressly had coverage for builder's risk. So it is fundamentally and completely distinguishable from the policies that are in effect in this case. So intergovernmental risk... Even though that case goes into detail saying that there's no difference? Well, what the case says there, Your Honor, is that there was a policy that, and it was a property policy, and this is at page 748 of 692 North East 2nd, specifically says that the property policy, it was one policy, also provided that it covered, some quote, the interest of the insured in buildings, structures and personal property at newly constructed, acquired or leased locations or any builder's risk within the territorial limits of this policy. So the property policy in intergovernmental risk was one that also had builder's risk coverage. In the Empress case, there were two separate policies. There was a separate Texas insurance company builder's risk policy. The property policy issued by National Fire and Marine and Lloyd Syndicate Ascot was a preexisting property policy. And not only did it not by its terms cover the renovation project, it expressly excluded any renovation project, except to the extent that it was under $10 million. This was a $50 million project. So we have a very important distinction here because what the court in intergovernmental risk said, and what Your Honor, I believe, is alluding to, is the court there said, quote, the issue is not whether the policies are called all risk or general liability policies, but whether those policies cover the risks and losses eliminated in the construction agreements between the village and the architect and contractor. So clothing and all of the statements of the court in intergovernmental risk, Your Honor, were in the context of a property policy that also had builder's risk. Our circumstances could not be more different. We have a builder's risk policy, but that was access only. The National Fire and Ascot policy, the property policy, was preexisting by several years and expressly excluded property in the course of construction which would have included this particular renovation project. So I would submit to the court that intergovernmental risk is certainly an important case to look at, but it is not, now is it not binding. It is completely and fundamentally distinguishable, and the point that the court made in the intergovernmental risk, the holding, which was that if under 11.4, if the policy, if the insurance was applicable to the work, then, golly, we can't distinguish between, it's the one policy, the property policy there, we can't distinguish between the property coverage in that policy and builder's risk coverage in that policy. We don't have that. We have the complete opposite situation where there's a separate builder's risk. We completely exclude builder's risk coverage. So therefore, the holding in intergovernmental risk not only is inapplicable, the opposite result should obtain based on the principles stated in that case. Okay. Thank you. So the point that the court has made leads exactly to where I believe this case needs to go in terms of analysis and decision, which is that rather than waivers of subrogation representing always a complete risk transfer, as the defendants have urged, this court and the trial court, and as the trial court seemed to adopt, as intergovernmental risk itself points out, the scope, it holds, well, it states, quote, a waiver of subrogation clause cannot be enforced beyond the scope specified. So that tells the courts that in analyzing the scope of a waiver of subrogation, we don't assume that it's a complete risk transfer, as the defendants have urged, but rather we consider, we parse, we interpret, the courts do, the meaning of the terms used. So let me ask you one more. If the general policies of IMPRIS do not apply under 11-4-5, why did National Fire pay for the policies? I'm sorry, I didn't hear the last part. Why did National Fire pay? They paid for the non-work property because it was insured under the property policies, but it was the existing structures that were not part of the renovation project. So the builder's risk policy paid for the work as defined in the construction contract, which was the renovation project. The National Fire policy paid for the other proportions of the existing buildings that were not covered by the builder's risk. But the key to this case is to parse paragraphs 11.4.1, .5, and .7. The waiver of subrogation provision itself is found in section 11.4.7. And it states, and I quote, the owner and contractor waive all rights against each other and any of their subcontractors, sub-subcontractors, agents, and employees, and then we skip some words, for damages caused by fire. And this is the key words in the contract that I believe are dispositive. Quote, to the extent covered by property insurance obtained pursuant to this section 11.4 or other property insurance applicable to the work. So let's take this. You're taking that language of other property insurance applying only to the work specifically. In other words, what was being done at that time and not what was previously contracted to. Yes, Your Honor, because it, well, what was contracted, the term work is defined in the construction contract. At paragraphs section 1.1.3. And it says that the term work means the construction and services required by the contract documents, whether completely completed or partially completed, includes all labor, materials, equipment, and services provided to or to be provided by the contractor to fulfill the contractor's obligations. So the work refers to the renovation work that was being performed on the casino, not just that day, but during this project. As I understand it, there was limited work that had been started before the fire destroyed the rest of the casino. So 11.4.7, which is the waiver. So if there's a waiver here, it is determined, it is defined by its terms. It says two possible ways the waiver applies. One, to property insurance obtained pursuant to this section 11.4. Under 11.4.1, the property insurance that's to be obtained pursuant to 11.4 is limited to the following. The owner shall purchase and maintain property insurance written on a builder's risk. All risks are equivalent policy form. So it's a builder's risk. So prong number one doesn't apply here. Prong number one says that the waiver would apply to the extent covered by property insurance obtained pursuant to section 11.4. Well, that's only builder's risk. By definition, that does not apply to the property policy, which expressly excluded any coverage for damages to the work. So prong one doesn't work. What's prong two under 11.4.7? The waiver provision itself. To other property insurance applicable to the work. And under 11, so under that prong, other property insurance applicable to the work, that's also not the property policies which expressly exclude the work. Now, the defendants have cited to yet another provision, and that is 11.4.5. And that's important for the court to consider. And 11.4.5 says, if during the project, construction period, the owner insures properties, real or personal or both, at or adjacent to the site, by property insurance under policies separate from those insuring the project, the owner shall waive all rights, and then this is the key, in accordance with the terms of section 11.4.7 for damages caused by fire or other causes of loss covered by the separate property insurance. So to the extent 11.4.5 might pick up separate property insurance, that's not the builder's risk. It is limited to, the waiver is limited to the terms of section 11.4.7, which, as we've seen, are limited to insurance that is applicable to the work. So there's 11.4.7, there's two prongs, there's only two ways the waiver can apply. Neither applies in this case. And 11.4.5, which the defendants have relied on, sends you back to, the waiver is to be in accordance with 11.4.7. So we end up back to 11.4.7 under every provision in the construction contract that leads to a waiver, and the waiver by the express terms of 11.4.7 is only for property insurance applicable to the work. So that is a clear exclusion from the waiver in the construction contract of insurance that is not applicable to the work, and that's the distinction, your honors, that intergovernmental risk leads us to. Because in that case, the court held that since 11.7 was the same language, it's the American Institute of Architects form, AIA, in that case 11.4.7 said, just like in our case, that the waiver would apply to property insurance applicable to the work. In intergovernmental risk, the property insurance was applicable to the work because it had builder's risk coverage. In our instance, not only is it not applicable to the work,  So we have the very basis for intergovernmental risk, which is that the property policy in that case was applicable to the work because it had builder's risk coverage is absent in our case, and it's not just silent, the policy screens, we exclude property in the course of construction. So therefore, intergovernmental risk, which perhaps upon a superficial reading might sound like, well, it's covering some of the same issues, when you actually parse it and you understand the basis of the court's ruling, which is that the property insurance in that case was applicable to the work because it covered builder's risk, that is completely inapplicable to the Empress situation where the property insurance excludes the work. So the plaintiffs contend that parsing the very clear language, they broke it up into three provisions that you have to kind of connect up, but parsing the language, it's pretty obvious and it's pretty clear that the property insurance here issued by National Fire and by ASCOT, Lloyd's Syndicate, is excluded from the limited waiver in 11.4.7. All right, thank you. There are other... I'm sorry. No, go ahead. Yes, thank you. Let's talk about that money issue just for a minute so I can sort it out in my head. Your colleagues in their brief indicate that there was $83.6 million of damage from the fire and that Empress was paid $81.1 million from its insurance companies for the cost of the damages and paid the rest as deductibles. And so what money are you looking for here? I see on the curve for relief $9.8 million. Explain that to me. So there's three components. There was the deductibles, which I believe are $2.5 million. Okay. There's the portion that was paid by AXIS, which was... What was the number on it? I'm not sure. Yeah, Randy would... Roughly $8 million. Okay, that's that number you're on. Got it. And then the balance, the $87 million, was paid by National Fire and ASCOT to compensate Empress for losses to non-work property for the existing structure that was not being renovated. That's the lion's share of the losses. Okay. So if you were to carve out the builder's risk, that's the eight-and-a-half, roughly, number. But the rest would not be subject to a waiver as National Fire and ASCOT content. So what's really significant here is that the plaintiffs, we have cited various cases from other jurisdictions, the Copper Mountain case, Fidelity and Guarantee, which construed the language in this AIA form contract to not apply to damages to the non-work property. And the defendants have cited principally intergovernmental risk. What is extremely significant is there is no reported case that either or any of the parties have identified in which there was a situation where there was a separate builder's risk policy and another separate property policy that excluded coverage to the work. So all of these other cases, the ones we cited, the ones defendants cited, they all involve one or more policies that covered both. So we have a unique situation as far as the reported law goes. We have a hermetic separation between coverage for the builder's risk and coverage for the preexisting property, the non-work property, which plaintiffs submit compels an opposite result, a different result from any cases, specifically intergovernmental risk. The factual difference that is at bottom in this case, the two separate coverages, takes it out of any of the other holdings and compels a different result. Because intergovernmental risk, and the court there specifically said that. It's like the court said, well, this is the same insurance. It's got property coverage. It's got builder's risk coverage. And 11.4.7 says insurance applicable to the work. Well, this insurance was applicable to the work. We're not going to pass out separate coverages under the same policy. We don't have here the same policy. So the national fire insurance was not applicable to the work. It does not fall within 11.4.7. It does not fall within the logic of the intergovernmental risk court's ruling, which under those circumstances perhaps was justified. You had a single policy. It had both coverages. It was applicable to the work. We're not going to say, well, this page applies to it and this page doesn't. The language of 11.4.7 is insurance applicable to the work. In intergovernmental risk, that hybrid property builder's risk insurance was applicable to the work. Ours was not. So I submit that it is extremely important that no court that we've been able to find in Illinois or in any other jurisdiction dealt with a situation where you had a separate property policy that excluded the work because under the terms of 11.4.7, the waiver clearly doesn't apply. In addition, the plaintiffs contend that the trial court in dismissing the breach of contract claims against the defendants was committed error because to the extent that the waiver of subrogation applied, the breach of contract claims survived. Empress's deductibles once again are excluded from the waiver of subrogation and from the specific deductible provision in 11.4.1.3 because the deductibles for the property policies are not subject to the construction contract whatsoever, just like those policies are not subject to the waiver of subrogation. So there's two other fairly major issues, which are that the trial court in dismissing the plaintiff's claims not only dismissed the subrogation claims and Empress's claims for negligence, but rather there were separate counts for willful and wanton misconduct. And as the court knows under Illinois law, there is a very strong and compelling and long-standing public policy that forbids a party to exculpate itself from its willful and wanton misconduct. Counsel, I think you're wasting your time on that argument. I'd move on. I'm sorry? I said I'd move on. Don't waste your time on that argument. Okay. The final argument, Your Honor, concerns Averis or Averis, I'm not sure quite how to pronounce it, which was the Averis, thank you, which was the grease scraper. They were originally called Facilitech and they became Averis. So they, it is undisputed that they did not have any contractual obligations or any role in performing a work as part of the renovation under the construction contract. Rather, they had a completely separate contract that predated by several years the construction contract and the renovation project. And what they did is they would come in in commercial kitchens. It was just an oral contract, right? Well, Is there something ultimately reduced to writing? Yes, Your Honor, but not signed. So there was a term sheet that reflected the terms and it's stipulated by the parties as to what the terms were. Gotcha. There was a contract. They would come in in the kitchens in the casino. There was a buffet and I think there was a steakhouse. Anyway, in the kitchens they come in and because when you cook on commercial ranges, just like at home, there's grease that's generated. Hamburgers is a good example. And it's vented to prevent fire and if you don't scrape the inside of those ducts, it poses a fire risk. So they were contracted to go to various areas in the casino and clean the exhaust ducts, including in the kitchen. That was apparently not done in this case. The ducts, which predated the construction project by years, maybe decades, had grease in it. When one of the contractors for the renovation project went to attach new duct work to the existing old duct work, which had been there years before, which had been scraped and lately not scraped years or months before, the welder set the grease in the duct on fire and that's what caused the fire. So Averis contends that it is entitled to take advantage of the waiver of subrogation under the construction contract. So the question is how far does the waiver extend? Correct. And so, exactly. So the guy that delivers food, poisoned food, is he covered? We would contend not, but we would contend that Averis clearly is not covered either because it is not one of the contractors or subcontractors that perform work, and this is stipulated, that perform work pursuant to the contract. But Averis points to section 6.1.1, which says, I quote, the owner reserves the right to perform construction or operations related to the project with the owner's own forces and to award separate contracts in connection with other portions of the project or other construction or operations on the site under conditions of the contract identical or substantially similar to these including portions related to insurance and waiver of subrogation. So the defendants contend that Averis represented other construction or operations on the site, but they had nothing, and they cite two cases. The contracts have to have something to do with construction, right, under that statute, the specific language. Sorry? And here they don't. That's our position. The defendants dispute that. They cite two cases. One dealt with the provision of a natural gas line to a construction project. The other dealt with the use of material on the project, paint strippers. Completely different than our situation because the scraping services had nothing to do with the renovation project and, in fact, predated it by years. This is just continuing maintenance, is it not? Exactly. That's exactly right, Your Honor. So we would contend that Averis is clearly not entitled to protection of the waiver of subrogation under 6.1.1 or under 11.4.7. One argument they've made is that if the court doesn't adopt a very broad reading of the waiver of subrogation to apply to Averis, then Averis could just bring in the other contractors of the other defendants if they were protected by the waiver of subrogation under our contribution theory. However, that does not obtain because under the Contribution Act, in order to have a claim for contribution, there has to be a joint liability arising out of the same injury. And we've cited to the court the Contribution Act as well as several statutes that apply that. And, in fact, the statute 740 ILCS 100-2 specifically says that in order to have a claim for contribution, it has to be, quote, subject to liability and tort arising out of the same injury to personal property. And that would not be the case if the defendants were immunized by a waiver of subrogation. So the plaintiffs contend that all of the claims that were dismissed by the trial court are valid and viable, and we would request that this court reverse the trial court's ruling in favor of the defendants on summary judgment and remand with instructions. Mr. Green is going to address the access issues, unless you have any other further questions. Thank you very much. Mr. Roberts, may I please the court? The two issues that I was going to address that are unique to Avarice are similar to Mr. Rubinowitz's arguments, one as to the willful and wanton and one as to the Avarice. Do us a favor. Keep your voice up. I'm sorry. That's not amplification. That's not recording. That's just a recorder. I appreciate that. I apologize. I took it from Your Honor's comment when Mr. Rubinowitz attempted to move to the willful and wanton. The court wasn't interested in argument about the competing public policy interests. We're not. Okay. Well, and I would echo then the point, the issue as to Avarice applies to my client. Even though we are the builder's risk policy, we would adopt the same argument, which is that to understand the contractual scheme here, there's an existing property and then there's property that was being renovated. The builder's risk policy was obtained for the purpose of ensuring the workmen the work for the renovated portion. So the defendants make a lot of arguments about the contemplations of the parties when they go and consider the contractual schemes and that the insurance companies consider that when they build in the premium. To extend the waiver of segregation to disinterested parties to the construction would empower that waiver of segregation that should be strictly construed. Your Honor made the comment about the fee poisoning. I made a similar argument, that is, imagine the workers ordered pizza and the delivery person hit the accelerator instead of the brake and drove in and did the same damage. That delivery person would be suddenly immunized by this waiver of segregation that seems to be really a stretch as to what the waiver of segregation is intended to protect. They have an unsigned contract that was for cleaning ductwork and they suddenly find themselves subsumed into this contractual scheme. With that, that is my argument. Thank you. Thank you. One of the major hurdles you get is the 10 million limit on one of the policies. So they are saying it doesn't apply. Go from there. Justice Smith, when we began this morning, one of the things that you mentioned was that this opinion in Intergovernmental was written by Justice Gordon and asked the lawyers to be aware of that. I'd like to address that because I think that may answer your question. Justice Gordon's opinion was well written. It's been well received nationally. In fact, if you look at what the Indiana Supreme Court did last year, they effectively validated everything that Justice Gordon said in Intergovernmental. It's an opinion that's been roundly followed across the United States. And the problem with the arguments being advanced by the insurers here is they want this court to depart from the well-reasoned decision in Intergovernmental. And they want to go back to the Copper Mountain case in Colorado. Now, remember the Colorado's Copper Mountain case is not even unanimous with the Colorado Supreme Court. In fact, justices there don't even agree on it. It's not been followed by any other court and, in fact, represents a minority position. So the idea that there's going to be something where you can parse out insurance policy based upon recoveries or whatnot, parsing is counsel's term, that doesn't fly in Illinois, and it didn't fly with Justice Gordon. Now, the one thing... Just before you get too far, because I thought what I understood counsel was saying, distinguishing Intergovernmental was that in Intergovernmental there was one policy, but here we have more than one. So how do you get around that as a huge, in my mind, distinguishing factor? Well, Justice Cox, remember that what Justice Gordon said in Intergovernmental, focusing on the or other insurance property language, is he said that that includes all-risk insurance policies. Now, what the insurers have agreed is that it does... the waiver of subrogation applies to all of the builder's risk policies. The issue is the all-risk. And if the all-risk is other insurance, then that subrogation claim is taken care of as well. That's extinguished by the waiver subrogation provision. And one of the things that I think we need to remember is that we need to put this in context. If you have a general contractor like O'Neill that's looking to contract for a casino, one of the biggest issues they face is loss of gaming revenue. I mean, that is the big, big issue. If there's no insurance company, strike that, there's no general contractor that's going to assume that risk. And so they do that risk transfer or they take that into account in a number of ways. If you don't want to be responsible for the loss of gaming revenue, then what you do is you ensure that you have the broadest possible waiver subrogation provision. And what you also do is you transfer all the risk for that property loss to the insurance companies. And that's exactly what happened here. In using the AIA form, what they did is they adopted the AIA approach, which is to ensure that risk of loss is transferred in total to the insurance companies and not assumed by the contractors. In that way, the general contractor can price his job accordingly and doesn't have to take into account the huge risk they face for loss of gaming. I just want to interrupt you, but it keeps flashing in my mind. What would an average cost per year be on this insurance? I mean, I'm in theory concluding that emperors got off easy, that they probably paid more for insurance than they actually got back. As the lawyer for O'Neill, I wouldn't know that. But I think what the court is really saying in its comment is that if you look here, if you look at what happened in this case, emperors was made whole. Remember that. This isn't a case that was driven by emperors. This is the insurance companies that are trying to recover back in the subrogation. And that's what changes the whole equation. That's why Wolfram wanted this out. That's why we have what we have here. So emperors has been made whole. And what was occurring on this program, on this policy, and on this construction project, is the entirety of the risk of loss was shifted by agreement to the insurance companies. Now, that brings with it another comment that I think the court needs to take into account. One of the things that Mr. Green said in his comment, and is absolutely true, is that the insurance policies in this case, in all of them, all of them, had waiver subrogation provisions. That means that when these policies were rated and the premium was paid, they took a premium taking into account that they were waiving all subrogation. If you turn that around, what that means is they're looking here for windfall. They've already received premium for the waiver of subrogation because they expressly agreed to assume this loss. Now what they're doing is suing the contractors in a way that was never contemplated by anybody to try and get that money back. And this court should not permit that windfall. And Justice Gordon says this windfall should be extinguished. And I believe this court should do the same. Remember what Justice Gordon said is that all risk policies are other insurance. And that is the truth. So what we have here is an attempt by the parties, by way of contract, to shift the entirety of this risk to the insurance companies and not assume it themselves. And remember what that says. One of the things about Justice Gordon's opinion that was just, it rings true, it's pure wisdom, is that this is a decision that harmonizes the interests of injured tort plaintiffs with the business community. What it says is that the business community can shift all risk of loss to an insurance company which takes a premium for that waiver of subrogation. But what it also says, and citing to the parachute case that the insurers included in their response brief, it doesn't take into account the injured tort plaintiffs. So think about the wisdom of that. What it says, what that opinion says is that the industry, both construction and insurance, can shift the risk of loss and nobody's harmed. The insurance company took a premium, empress is paid whole, and O'Neill can do their job. Think about the alternative. What that means is if we don't have that type of rule in the state of Illinois, that means that casinos don't get built, renovations don't get done, and people don't work. One of the things that is the overarching issue in this case is the tremendous policy issues that are attended in that opinion, intergovernmental. Remember that you have the issue of complete risk transfer as the contractor is bidding to the casino and doesn't want to be stuck with the loss of gaming revenue. What you also have is the point that was made in intergovernmental, that when you have that smoking hole, when you have that building that's on the ground after it's burned, you want to have litigation that's going to take place over, well, this was 10 years ago, almost eight years ago that the building burned down. So here we are today, fast forward eight years later, do we want to have litigation that prevents the renovation of that building and the reconstruction? Or do we want to have a scene, a scenario where the insurers pay as they did here, that money is used to fund that casino, it's rebuilt, and it puts people back to work? The policy issues here are just overarching. We also have the issue of the insurer taking a premium for that risk and including in their policies the waiver of subrogation. So the policy issues can't be separated from what is going on here. And remember what the AIA says, and what they include in their manual, is the whole idea of having the complete risk transfer, that includes everybody, is that what we are doing is shifting the risk of loss from the contractors, even from Averis, to the insurance companies, and that's what they bargain for. So let me spend a minute talking about the scope and extent of the waiver of subrogation. Mr. Balvo put in his brief, quoting from Gertrude Stein, that a waiver is a waiver is a waiver. I thought it was a brilliant comment. Because what it does is it states that we have a waiver here that's not pro tonto and it's not partial. It's a complete waiver of subrogation. And that's consistent with the policy issues that we have before this court. So if we have a waiver of subrogation and we have insurance companies that pay, what is the scope of the waiver? Well, I submit to you that virtually every case in the majority line of authority that is considered the issue says that it is the money that's paid. It is the insurance money that's paid. It's that way of subrogation that's being waived. So if we talk about what the waiver is, it's not a waiver as to a builder's risk policy and it's not a waiver as to an all risk policy and it's not a waiver as to loss of gaming revenue. It's a complete waiver. And if we are going to have a waiver in this case and it's going to make sense, then we have to have a complete waiver. And that complete waiver or that complete risk transfer can only come about by doing exactly what Justice Gordon said in Intergovernmental, and that is to make all the insurance policies within the waiver and to measure the waiver of subrogation by the scope of the insurance monies paid. In other words, the insurance companies paid money and it's that payment that is waived in the waiver of subrogation provision. You know, we have a combined brief here from the Appellees and it includes Averis. Isn't there a conflict in the two positions? No, sir. Aren't they sort of in a different factual and legal situation? They're really not because if you have a complete waiver and if you have a complete risk transfer, that includes everybody. This is not the instance where you have bad pizza or you have bad food being brought to the job. What you have is an allegation of Averis being involved in the process that leads to the loss. And remember, if we accept the argument that the waiver of subrogation is defined by the scope of the insurance payments, that's what's waived, then Averis is certainly within that because it is the waiver of subrogation of the monies paid to cover the loss of the building at the construction site. So you're saying that's where the line is drawn? Sir, I'm saying that the majority opinions state that it is the extent of the insurance payments that define the waiver of subrogation because that's the waiver. All right. If there are no further questions, I would respectfully ask that the judgment of the trial court be affirmed. And I would appreciate this court listening to my colleague and friend Dan Boho because he always has a lot to say. That's a matter of public record. Thank you for giving me this open clock today. If it pleases the court, counsel. The waiver of subrogation, which is what we have here, provides that the owner who's bringing suit in the carrier on behalf of the owner waives all rights against the different parties to the contract and specifically noted in this agreement is the separate contractors described in Article VI. But let's stop for a minute because you asked a question if I may answer with regard to poison food or personal injury. If we look at 11.417, I want to talk about what is specifically waived because it's very narrow. What is being waived here, the owner waives all rights against separate contractors described in Article VI. That's my client, and I'll explain in a moment why we're an Article VI contractor. But what is being covered here is damages caused by fire or other causes of loss to the extent covered by property insurance. That's the nature of that which is being waived. Where's your contract, though, Mr. Boho, for Averis between it and O'Neill or any of its subcontractors? Every case that has handled that issue, including the case cited by counsel here, Indiana v. Ehrlich, and the Reliance and RLI case cited by my client, all say that the language in 11.4.7 says that the owner shall require of the separate contractors described in Article VI, by appropriate agreements, similar waivers in favor of each other. First of all, that argument is waived because they didn't raise that at the trial court, but it's a winning argument for the defense anyway. They waived the waiver? They waived the waiver, and then separately, that waiver was unenforceable by, we cited, I believe, seven cases in the trial court that we raised. There have been two cited by me here, Reliance and RLI, and they cite a case, the Indiana v. Ehrlich, all of which say, because it's the responsibility of an owner to have that reciprocal waiver, if the owner doesn't get the reciprocal waiver, then they can't rely on that as a sword. That's held by, Indiana v. Ehrlich is a separate contractor which they cite, and it specifically says if the owner does not obtain the reciprocal waiver, the owner is hardly in a position to complain. In RLI, another separate contractor under Article VI, it states if an owner did not get a reciprocal waiver, they cannot wield the lack of the reciprocal waiver as a sword because that was the responsibility of the owner. Let me ask you a question. The contract defines subcontractor as an entity who has a direct contact with the contractor to perform a portion of the work at the site, and a subcontractor is an entity who has direct or indirect contact with the contractor to perform a portion of the work at that site. Your party has no direct contact with O'Neill or any of O'Neill's subcontractors. I can answer that. I have actually a double answer to that one. First of all, the trial court said in this particular case that my client was involved in the work of the contractors and subcontractors. I thought he was kind of spoken. If you look at the first line of the argument on page 10 of the brief of the plaintiffs here, the first thing they say on page 10 of their brief is that the actual language is Empress Casino Joliet was destroyed by fire due to a welder's use of torch to attach two pieces of ductwork for a kitchen range, one of which was caked with cooking grease. So they're literally taking the previously cleaned vents and using it in the work that was being done that is being called the cause of the fire. So if you are actually taking the work being done by the other contractor and you take that work and apply it to the work that's being done, then as the trial court said, I can't understand how that wouldn't be part of the work. But what I'm relying on is the language in 6.1.1 that goes beyond subcontractor. So it doesn't just provide subcontractor coverage. Because remember, the wages of subrogation paragraph said the owner weighs against separate contractors described in Article VI. So the question is, is my client, a heiress, a separate contractor described in Article VI? When you go to 6.1.1, the owner reserves the right, and they basically talk about four activities, to perform construction or operations related to the project with their own forces, so they do that themselves, or award separate contracts in connection with other portions of the project. What's the project? The project is described as the... Is the project remodeling the kitchen? Is the project cleaning the vents in the kitchen? No, no, this language is not related to my work for the project. The project is the project between Empress and W.E.O. Neal. Right. Because this is W.E.O. Neal's contract. So if I wanted to get into the coverage for my client for being related to the work, then I'd have to show that we were a separate contractor in connection with other portions of the project. And you agree you were not? No, the trial report I'm relying on actually said, if you're going to have the two welded together, then you are part of the work. So to speak. But in any case, the part that clearly applies to my client is other construction or operations on the site. So you have the two activities related to the project on the site, and then you have other construction or operations on the site. There is no requirement that that be related to the work. And in fact, the trial report also said, it doesn't say related to the work, it says you have construction or operations first related to the work, either done by the outfit itself or contracted for, but then it says, or other construction or operations on the site. What about the language in the contract that says to those operations under conditions of the contract identical or substantially similar to these included in those portions related to insurance and waiver of subrogation? Okay, and that's similar to what Justice Lavin just asked. That was the part that was raised because that was not raised in the trial court. But secondly, the case cited by the plaintiffs in their own reply brief is Indiana v. Erwick, where Indiana v. Erwick said, if the owner does not get the reciprocal waiver, because remember this is where I mentioned under 11.8 of the waiver of subrogation, the owner is required to get the reciprocal waiver. If they don't, this is the case cited by the plaintiffs, if they don't get the reciprocal waiver, then they can hardly be in a position to complain that it's not included. I say, ROI, which says if the owner doesn't get a reciprocal waiver, it can't wield the lack of that waiver as a sword, and they cited reliance, which said you do not have to have that language because that's a requirement of the owner. So every court, they've cited no case for that proposition. And remember, we did a motion to strike that because it wasn't even raised in their brief. They know that every case, including the case cited by them, says that you can't rely on that. But there are other cases that also say even if that were a breach, it would be an immaterial breach. But the three cases cited by all the parties say that an owner who doesn't get the waiver, and it's the owner required to do it under 11.4.7, the waivers of subrogation provision, they are the ones that can't come and use that as a sword. The whole idea was kind of summarized, and if I may just kind of bring it to an end, by the ROI decision, which says holding that waivers of subrogation do not apply to suppliers. And by the way, the cases that we have cited have manufacturers of products. There's no contract related to this. Suppliers of products. These are all cases cited within the parties that are described as Article VI separate contractors. Providers of other labor. A natural gas supplier. So none of these are – none of those have the types of waivers that the plaintiffs are now – actually, the courts are asking. The plaintiffs really haven't argued that much. And they know because the cases all are against them. The manufacturers don't have reciprocal waivers. The suppliers don't have reciprocal waivers. And nor do the natural gas supplier. But in any case, the case I remember to cite was ROI v. Southern, which says holding the waivers of subrogation do not apply to product suppliers and manufacturers with remnant protection illusory. If insurers can bring claims against product suppliers and manufacturers, and then the suppliers and manufacturers should be expected in turn to bring contribution claims, in that case, the protection under the contract, the parties to the contract would be found illusory because they'd end up being third-party defendants when it was an intention. There'd be no liability and no subrogation for that very limited, as I showed you in 11.7, just for fire-related property loss, not personal injury or anything else. My closing comment is just that initially when this was written, this was written as a very wide coverage of subrogation so that the insurance would ultimately cover the loss. And yet you now have a situation where an incident occurs and the carrier for the owner now takes out a spyglass looking for a hanging chad to sort of pull on. It's not there. Thank you. And I ask that the judgment of the trial court be affirmed. I'm sorry, any questions? Thank you. Your Honors, I'd like to start with Mr. Bovo's comments regarding Aviras because they're fresh. He quoted from Section 11.4.7, which is the waiver provision, but he didn't quote the whole sentence. He cut off what is the key phrase. So he quoted, he said that the waiver applies to other property insurance, but he left off the next four words, applicable to the work. That's what's dispositive here, applicable to the work. That goes not just to Aviras but to the other defendants as well. And addressing Aviras first, the two cases that they rely on, RLI and Reliance, which had to do with supplying a natural gas line to a hog processing facility that was being constructed, that's a supplier. And using paint stripper as part of a project, that's a supplier. Mr. Bovo is right that the cases have applied to product suppliers and manufacturers. That is not Aviras. Aviras was under contract for years, had, before the renovation project was even conceived, had gone in there and maintained the vents, the ducts, the grease ducts. And there was no connection whatsoever to this renovation project. They were not a subcontractor of O'Neill under this construction contractor. They were an independent contractor that preexisted, completely separate. And the only nexus they can come up with is that part of the existing building, the new renovation, was being connected to it. That's not within the intent of 6.1.1. It is clear that Aviras is not entitled to the benefit of the waiver of subrogation under 6.1.1. All the work they did had nothing to do with the project whatsoever. I'd like to address the broader comments on the waiver. So the defense counsel is trying to blur the distinction between intergovernmental risk, Justice Gordon's opinion, and our circumstances. The distinction that I tried to make clear in my opening argument is the key here. The fact that they had to resort to appeals to policy issues and risk transfers is very telling because they avoid parsing the language. As Justice Gordon pointed out, intergovernmental risk, the scope of any waiver of subrogation is limited to its terms. That's basic contract law. There cannot be just a general appeal to public policy. A very interesting comment about the premiums, I thought. Well, there would be a windfall if the insurers are allowed to charge premiums and get their money back under a subrogation claim. The premiums that were charged for the property policies, the policy itself excluded renovation projects, excluded any construction over $10 million. So by definition, there was no premium charged and paid by Empress to National Fire and ASCOT for a renovation project. That policy excluded coverage for that. And in fact, we can presume and infer that the premiums were lower because of that. The fact that they didn't have to insure it, the fact that they expressly excluded construction when you're dealing with hot work, torches and such that too often lead to fires and substantial damage, they paid a lesser premium. If the renovation work was in fact covered under the property policies, which it was not, the premium would have been substantially higher. So the point that the defense counsel made actually supports the plaintiff's position. But the key here is, contrary to what the defendants urge, a waiver is not a waiver is not a waiver. As Justice Borden teaches, you have to parse the language. And a waiver of subrogation is not enforceable beyond the scope of the words used. So what does 11.4.7 say? That is the operative waiver provision. The owner and contractor waive all rights against each other and any of their subcontractors, sub-subcontractors, agents and employees for damages caused by fire. Quote, to the extent covered by property insurance obtained pursuant to this section 11.4, which was only buller's risk, or other property insurance, key, key, key phrase, applicable to the work. The National Fire and Ascot property policies do not fit within either of those two prongs. The waiver is completely inapplicable as to them. And we urge this court to carefully consider the language used and the very fundamental and important distinction between the circumstances presented in this case and those that faced Justice Borden when he understandably said, well, I have a property policy here. It also contains buller's risk coverage. And he says, quote, the issue is not whether the policies are called all risk or general liability policies, but whether those policies cover the risks and losses delineated in the construction agreements between the village and the architect and the contractor. And he went on to say, and this was his ruling, quote, the policy also provided that it covered the interest of the insured in buildings, structures, and personal property that newly constructed, acquired, or leased locations, or any buller's risk within the territorial limits of this policy, which had been previously unclared. These provisions show, and this is his ruling, these provisions show that the policy covered contractors or buller's risks associated with construction of the village buildings. That was the holding in intergovernmental risk. That holding was correct. That holding does not apply to the circumstances presented before this court. And we respectfully urge the court to reverse and remand the judgment of the trial court with instructions. Thank you. Thank you. We'll take it under advisement. We enjoyed the arguments of both sides. They were very well done. Even if the exhibit lacks Mr. Boho. And the one thing we can't do is we can't pick up a phone and call Joe Gordon and see what he thought. A lot of these cases I'd love to pick up the phone and talk to him. Thank you.